**SO ORDERED.**

**SIGNED this 9th day of May, 2019.**



*Dale L. Somers*
Dale L. Somers
United States Chief Bankruptcy Judge

___

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In re:<br><br>Lindy Lee Graham,<br><br>        Debtor. | Case No. 17-21139-13 |
| Roger James Graham,<br><br>        Plaintiff,<br><br>v.<br><br>Lindy Lee Graham,<br><br>        Defendant. | Adversary No. 17-6056 |

**Memorandum Opinion and Order
Entering Judgment on Plaintiff's NonDischargeability
Complaint under 11 U.S.C. § 523(a)(2)(A)**

Debtor/Defendant Lindy Graham filed a Chapter 13 bankruptcy petition, and therein listed as unsecured debt a "property settlement" to her former husband Roger Graham for $32,591.47. The "property settlement" was

actually a judgment from state court requiring Debtor to reimburse her ex-husband for overpaid maintenance. Shortly thereafter, Plaintiff Roger Graham filed this adversary petition against Debtor, objecting to the discharge of that debt under 11 U.S.C. § 523(a)(2), § 523(a)(5), and § 523(a)(15).[1] The Court previously granted judgment to Debtor on Plaintiff's claims under §§ 523(a)(5) and (a)(15), without prejudice to Mr. Graham renewing the § 523(a)(15) claim if Debtor seeks a discharge under § 1328(b) or converts her case to Chapter 7.[2]

The claim under § 523(a)(2) proceeded to trial.[3] The Court now concludes Plaintiff has not met his burden to show the judgment against Debtor for $32,591.47 is nondischargeable under § 523(a)(2), because Plaintiff did not meet his burden to prove the overpaid maintenance was obtained by "false pretenses, a false representation, or actual fraud." As a result, the Court enters judgment for Debtor, concluding that Plaintiff's $32,591.47 judgment against Debtor is dischargeable.

---

[1] All future references to Title 11 of the United States Code will be to section number only.

[2] *See* Doc. 55.

[3] Debtor appears by Nancy Leah Skinner. Mr. Graham appears by Bradley D. McCormack.

## I. Findings of Fact

Roger Graham is Debtor's ex-husband. Mr. Graham and Debtor were married in November 1998 and had three children together. Mr. Graham filed for divorce from Debtor in May 2012. During the pendency of their divorce, Mr. Graham was ordered to pay Debtor interim maintenance. The "interim" of that maintenance ended up being lengthier than most, as the parties' divorce, property settlement, and child custody issues were all contentious.[4]

Over a year into this interim period, the parties began disputing a motion by Debtor to increase Mr. Graham's maintenance payments and child support. Soon thereafter, on November 26, 2013, Mr. Graham filed a motion to terminate that interim maintenance. At a December 12, 2013 hearing on the competing motions, Mr. Graham alleged that Debtor was living with her boyfriend and receiving financial support from him, and as a result, was cohabitating in a marriage-like relationship and should, therefore, not be

---

[4] For example, the Court heard extensive testimony about the property Debtor removed from the marital home at the time she moved out, and then Debtor's subsequent use of Mr. Graham's credit card to buy new furniture from Nebraska Furniture Mart. The parties dispute how much Debtor removed from the marital home to furnish her new apartment, how much she bought, and how much she was authorized to buy on Mr. Graham's credit card. The parties also testified about issues in state court concerning their children that continue to this day. Clearly the parties have a difficult (at best) co-parenting relationship, but many of their disputes are irrelevant to the actual issue currently at hand.

receiving maintenance payments. At the hearing, Debtor unequivocally affirmed that she was in a romantic relationship with Daniel Schwent and that they were living together, but Debtor maintained that she and Mr. Schwent were acting as roommates by maintaining separate finances and expenses. The parties did not undertake discovery, and rested on the testimony given at the hearing. Within a few weeks, on December 31, 2013, the state court issued an order increasing Mr. Graham's interim maintenance to $1802 per month, setting Mr. Graham's child support payment to $235 per month, and requiring Mr. Graham to pay all direct expenses for the Graham children.

The parties' final decree of divorce was ultimately entered on April 17, 2014, nearly two years after the petition for divorce was filed, and a final Separation and Property Settlement Agreement was entered the same date. Per their final Agreement, Mr. Graham was ordered to pay maintenance of $1570 per month starting June 1, 2014, and continuing for 29 months.[5] The parties agreed that the maintenance was to "immediately terminate upon the first occurrence of:" (1) the completion of the 29-month term, (2) the death of

---

[5] With the maintenance beginning in June 2014 and continuing for 29 months, the last payment of maintenance would be made in October 2016.

either party, (3) the date of Debtor's remarriage, or (4) Debtor's "cohabitation with [a] non-relative male in a marriage like relationship as defined by Kansas law."[6] Debtor testified that she understood "cohabitating in a marriage-like relationship" to mean purchasing real estate or other substantial property together, and that it meant merging finances. Debtor also testified that she assumed the "precedent" of how she had been living with Mr. Schwent had been set with the state court after the state court's hearing on Mr. Graham's first motion to terminate maintenance, and strove to continue on as they had prior to that hearing.[7]

About two more years passed. This period is important more for what did *not* happen, than what did happen. Mr. Graham apparently kept an eye on Debtor's social media accounts and testified at length about what he saw there. Mr. Graham testified that he felt like Debtor was "living high on the hog" and "certainly did not appear to be struggling." Mr. Graham testified about viewing pictures on social media of a trip the Graham children, Debtor, and Mr. Schwent took together to St. Louis. Mr. Graham saw pictures on

---

[6] Debtor's Exhibit E, p. 7.

[7] The Court sees how Ms. Graham could have concluded this based on the colloquiality between Debtor's attorney and the state court judge at the December 12, 2013 pre-divorce hearing on temporary support. Debtor's Exhibit B, p.34, lines 6-13; Debtor's Exhibit C. This Court notes that the standards for temporary support and post-divorce support are different.

social media of wedding cakes, and rings, and he assumed that Debtor and Mr. Schwent were either engaged or planning to be engaged.[8] Importantly, however, Mr. Graham did not testify about a sole remark, let alone a false remark, and let alone a pattern of false remarks, from Debtor about her relationship status or whether she was cohabitating in a marriage-like relationship. In fact, the Court heard no testimony about any communications at all between the parties concerning Debtor's relationship with Mr. Schwent during this time period.[9]

Then, in March 2016, the proverbial straw broke the camel's back. Debtor, Mr. Schwent, and the Graham children took a trip together to St. Thomas. Upon their return, one of the Graham children showed Mr. Graham a video of Debtor and Mr. Schwent becoming engaged while on the trip. Quickly thereafter, in April 2016, Mr. Graham's attorney sent Debtor a letter demanding to terminate maintenance from that point through October 2016,

---

[8] Apparently, Mr. Schwent had asked Debtor to marry him, but she refused. Mr. Schwent also gave Debtor a ring to wear merely to show she was not single in October 2015, and Debtor maintains she and Mr. Schwent did not become engaged at that time.

[9] Mr. Graham's state court attorney mentioned an October 2015 motion in the state court to stop Debtor from changing the Graham children's school, and in relation to that motion, Mr. Graham apparently requested a copy of Debtor's then-current lease because it was related to a school boundary issue. The lease was not provided, but the Court was given no further details.

which was the end of the mandated term, because Mr. Graham believed Debtor was cohabitating in a marriage-like relationship. Both parties agree that Debtor responded, through her attorney, denying the request. Mr. Graham contends Debtor responded "no" because "she needed the money." Debtor contends she responded "no" because the engagement changed nothing financially and that she and Mr. Schwent continued to maintain separate finances.

Debtor testified at trial that she did not try to hide her engagement from Mr. Graham. Debtor knew her daughter was videotaping the engagement and assumed the children would say something to Mr. Graham. Debtor did not tell the children to hide the engagement. Debtor claims after she and Mr. Schwent got engaged, nothing changed in their living or financial arrangements.

Mr. Graham was not convinced. On May 31, 2016, Mr. Graham filed a motion in state court to terminate maintenance. Mr. Graham undertook extensive discovery on his motion: he subpoenaed Debtor's financial records and obtained copies of the leases Debtor and Mr. Schwent had signed. Debtor and Mr. Schwent's first lease had been a five-year lease with an option to purchase, and the next lease was a three-year lease. The parties dispute why Mr. Graham resorted to subpoenas for the information. Mr. Graham contends

Debtor was refusing to cooperate in discovery. Debtor contends she gave her attorneys all the documents she had and that others were not readily available. Debtor contends she never refused to provide any documents to Mr. Graham. Mr. Graham's attorney who represented him in state court testified at trial, and she indicated that they subpoenaed the records because it was "easier" than filing a motion to compel.

A hearing was held on the motion to terminate maintenance on January 31, 2017. At that hearing, Mr. Graham's attorneys presented copies of checks written on Debtor's bank account. Debtor claimed to have signed all of the checks, even though it was clear based on the writing style that several of the checks had been signed by someone else, and at least a couple of the checks had been signed by Mr. Schwent. There was also an issue where Mr. Schwent had been added to the Graham children's school as a contact, and Mr. Schwent's desire to coach one of the Graham children's baseball teams. Throughout the state court trial, Debtor continued to maintain that she and Mr. Schwent had entirely separate finances, and were cohabitating, but were not in a marriage-like relationship.

On May 22, 2017, the state court granted Mr. Graham's motion to terminate maintenance. The state court granted the motion retroactively to January 5, 2015, concluding that Debtor had been cohabitating in a

8
Case 17-06056   Doc# 65   Filed 05/09/19   Page 8 of 17

marriage-like relationship since at least that date. In its order, the state court specifically found that Debtor had been "less than truthful" in her testimony about the checks and had concealed cohabitation.[10] The state court calculated an overpayment of $34,160.43 and entered judgment against Debtor for that amount plus post-judgment statutory interest.

About a month later, on June 21, 2017, Debtor filed her Chapter 13 bankruptcy petition.[11] Debtor scheduled the judgment on Schedule F as an unsecured debt. Mr. Graham then filed his adversary complaint, objecting to the discharge of the debt under §§ 523(a)(2)(A) (money obtained by "false pretenses, a false representation, or actual fraud"), 523(a)(5) (debt "for a domestic support obligation"), and 523(a)(15) (debt "to a spouse [or] former spouse . . . that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or

---

[10] Regarding her "less than truthful" testimony, Debtor contends she was frustrated and anxious at the state court trial because she had been up late the night before reviewing the documents she had just been given the afternoon before trial. Debtor claims she knew the checks came out of her account and that she knew she did not sign them, but that she did not intend to deceive. She claims she was under stress at the trial and was overwhelmed. Debtor testified she gave her "roommate" permission to sign her name to these checks because the payments needed to be made, she was unavailable to sign the checks, and they were for her debts.

[11] Post entry of the state court judgment, Mr. Graham immediately garnished Debtor's bank account and obtained a total of $26.75.

other order of a court of record"). As noted above, this Court granted Debtor's motion for summary judgment on the claims under §§ 523(a)(5) and (a)(15), and the parties proceeded to trial on the §523(a)(2)(A) claim.

## II. Conclusions of Law

An adversary proceeding to determine the dischargeability of a debt is a core proceeding under 28 U.S.C. § 157(b)(2)(I), over which this Court may exercise subject matter jurisdiction.[12]

### A. Nondischargeability Under § 523(a)(2)

Subsection (a)(2)(A) excepts from discharge any debt "for money, property, [or] services . . . obtained by . . . false pretenses, a false representation, or actual fraud." Mr. Graham bears the burden of proof to establish each element of his claim under § 523(a)(2) by a preponderance of the evidence.[13] To carry his burden based on a false representation, Mr. Graham must show that: "(1) the debtor made a false representation; (2) the debtor intended to deceive the creditor; (3) the creditor relied on the debtor's

---

[12] This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and §§ 1334(a) and (b) and the Amended Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's Bankruptcy Judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective June 24, 2013. D. Kan. Standing Order 13-1, *printed in* D. Kan. Rules of Practice and Procedure (March 2018).

[13] *Grogan v. Garner*, 498 U.S. 279, 287 (1991).

conduct; (4) the creditor's reliance was justifiable; and (5) the creditor was damaged as a proximate result."[14]

B.  Application to Mr. Graham's Claim

Mr. Graham has a difficult task from the beginning. The first two elements he must show are a false representation with the intent to deceive. A debtor's intent to deceive "'may be inferred from the totality of the circumstances.'"[15] "The bankruptcy court must consider whether the totality of the circumstances 'presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor.'"[16] A totality of the circumstances inquiry is fact specific and hinges on the credibility of witnesses.[17]

---

[14] *Ez Loans of Shawnee v. Hodges (In re Hodges)*, 407 B.R. 415, 419 (Bankr. D. Kan. 2009) (citing *Groetken v. Davis (In re Davis)*, 246 B.R. 646, 652 (10th Cir. BAP 2000)). The parties' pretrial order relies on the "false representation of fact' portion of a § 523(a)(2)(A) claim. Doc. 27 p. 6.

[15] *In re Young*, 91 F.3d 1367, 1375 (10th Cir. 1996).

[16] *Groetken v. Davis (In re Davis)*, 246 B.R. 646, 652 (10th Cir. BAP 2000) (quoting 3 Norton Bankr. Law & Practice 3d § 57:16 (2016)).

[17] *See Colonial Pac. Leasing v. Mayerson (In re Mayerson)*, 254 B.R. 407, 412 (Bankr. N.D. Ohio 2000) (finding that while "state of mind issues . . . are generally not to be disposed of upon summary judgment . . . [t]his . . . does not mean that summary judgment is per se inappropriate with issues concerning a person's state of mind").

Mr. Graham contends he overpaid the maintenance based on the "less than truthful" statements of Debtor—borrowing that phrase from state court, and that Debtor used obstructionist moves to hide the truth about her cohabitation from Mr. Graham. Mr. Graham alleges a planned-out course of action by Debtor to hide the truth about her relationship.

The Court finds this case to be difficult. The state court concluded Debtor began cohabitating in a marriage-like relationship at least by January 2015. It appears there was good reason for this conclusion: Debtor and Mr. Schwent were romantically involved and had been living together for a number of years. They shared a home and their lives, and the only thing "separating" them was that they purposefully kept their finances separate.

That said, for a debt to be nondischargeable under § 523(a)(2)(A), there has to be more. There has to be "false pretenses, a false representation, or actual fraud." There is just no evidence that Debtor was acting fraudulently. From all this Court has seen, Debtor was honest in her descriptions of her relationship. She never hid her relationship from Mr. Graham or their shared children.

Obviously, there were no false representations with an intent to deceive at the beginning of the parties' chronology: Debtor testified at the hearing on the first motion to terminate maintenance that she and Mr. Schwent were

romantically involved and living together, and the state court blessed interim maintenance at that point. And then as noted above, during the next two years, there is no evidence of *any* communication between Debtor and Mr. Graham. Debtor then got engaged in March 2016, and in April 2016, Mr. Graham demanded that maintenance be terminated. Debtor's response to this letter demand was the first communication between the parties on the subject in years. At that point, instead of disclosing the true nature of her relationship (as found by the state court), Debtor denied again that she was cohabitating in a marriage-like relationship and insisted that her engagement had changed nothing between herself and Mr. Schwent. This may have been a situation of Debtor sticking her head in the sand and hiding from the truth, but the Court just has no evidence that it was fraudulent.

The only time Debtor was not honest was at the trial on the motion to terminate maintenance where she misled the state court about who signed three checks on her account. But that "less than truthful" testimony in state court about who signed three checks on Debtor's own account is insufficient to make a nondischargeability claim. Mr. Graham's reliance on Debtor's false pretenses or representations must be justifiable "from a subjective

standpoint."[18] The misrepresentations made by Debtor at the state court hearing did not actually deceive anyone. "In order to rely on a misrepresentation," the party making the nondischargeability claim "necessarily must first be deceived."[19] "A person cannot rely on a representation if 'he knows that it is false or its falsity is obvious to him.'"[20] The misrepresentation about who signed the checks on Debtor's account occurred in state court at the hearing to terminate maintenance, which occurred well after Mr. Graham's obligation to pay support had ended.

The situation herein is similar to that found by the bankruptcy court in the *In re Taylor*[21] case. The *Taylor* case also involved an ex-husband's payment of maintenance, and a state court judgment finding that the ex-wife had been cohabitating in a marriage-like relationship and was not entitled to that maintenance. In the *Taylor* case, the ex-husband learned of the debtor

---

[18] *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 791-92 (10th Cir. 2009) (citing *Field v. Mans*, 516 U.S. 59, 74-75 (1995)).

[19] *In re Taylor*, 455 B.R. 799, 802 (Bankr. D.N.M. 2011), *aff'd*, 478 B.R. 419 (10th Cir. BAP 2012), *aff'd*, 737 F.3d 670 (10th Cir. 2013).

[20] *Id.* at 802 (quoting *In re Apte,* 180 B.R. 223, 229 (9th Cir. BAP 1995), *aff'd,* 96 F.3d 1319 (9th Cir.1996) (quoting *In re Kirsh,* 973 F.2d 1454, 1456 (9th Cir.1992)) (per curiam) (quoting *Restatement (Second) of Torts* § 545A.541 (1977)).

[21] *Id.*

ex-wife's cohabitation, filed a motion to terminate maintenance in April 2009, and then the state court awarded the ex-husband a judgment for overpaid maintenance from May 2009 through August 2010.[22] The bankruptcy court in *Taylor* stated:

> Because the Judgment awarding Plaintiff overpayment of spousal support is based solely on spousal support payments due *after* Plaintiff filed his motion to terminate, he could not have relied on Defendant's alleged misrepresentation when continuing to make spousal support payments after filing the motion in April of 2009. By April of 2009 Plaintiff already knew or believed that Defendant was not entitled to receive continued spousal support payments. He was not, therefore, deceived by any misrepresentation as to Defendant's right to continue to receive spousal support after April 1, 2009, and could not have made such payments in reliance on any misrepresentation by Plaintiff. Plaintiff argued that his continued payments of spousal support after the filing of the motion to terminate spousal support evidences reliance. The Court disagrees. There simply can be no reliance when the Plaintiff has not been deceived; his belief that Defendant misrepresented whether she was cohabitating contrary to the requirements under Virginia law for continued receipt of spousal support is what prompted Plaintiff to seek termination of his obligation. Similarly, because Plaintiff believed that Defendant was no longer entitled to receive spousal support, Plaintiff's loss was not caused by his reliance on Defendant's alleged deception.[23]

The facts herein are strikingly similar. Here, Mr. Graham learned of Debtor's engagement in March 2016, filed the motion to terminate

---

[22] *Id.* at 803.

[23] *Id.*

maintenance in April 2016, and then the state court awarded Mr. Graham a judgment for overpaid maintenance from January 2015 to October 2016. The facts are slightly different, in that in this case the state court reached back behind the time of the filing of the motion and awarded the judgment from before the motion was even filed. But that said, according to *Taylor*, there can be no reliance on a false representation once the ex-husband knows or believes that the ex-wife is not entitled to maintenance. Under *Taylor*, in this case, there can be no reliance at least as of April 2016, when the demand letter was sent by Mr. Graham to Debtor. And before April 2016, there was no communication at all between the parties, so where could the false representation come from? Mr. Graham finds himself in a true catch-22 situation. Once he filed the motion to terminate, the reliance element evaporated, yet there was still a court order to pay and failure to do so could have had troublesome consequences if the motion to terminate maintenance was denied.

Unfortunately for Mr. Graham, the Tenth Circuit has already discussed nondischargeability claims based on state court judgments for the overpayment of maintenance, and carrying the burden of proof on such a claim is difficult. Mr. Graham has not met his burden of proof to show nondischargeability under § 523(a)(2)(A). Debtor was certainly interpreting

16

"cohabitating in a marriage-like relationship" differently than was Mr. Graham, and the state court ultimately agreed with Mr. Graham's interpretation, but Mr. Graham has not shown that Debtor obtained the overpaid maintenance based on "false pretenses, a false representation, or actual fraud."

### III. Conclusion

Mr. Graham has not met his burden to show the debt of $32,591.47 is nondischargeable under § 523(a)(2)(A). The Court enters judgment for Debtor, and concludes that the debt is dischargeable. As the Court has previously ruled, if Debtor seeks a discharge under § 1328(b) or converts her case to Chapter 7, Mr. Graham may renew his claim under § 523(a)(15).

**It is so Ordered**.

# # #